Earl KRAMER, Appellant, (Defendant Below),

v.

Larry RAGER, Margaret J. Rager, Appellees. (Plaintiffs Below).

No. 1–1181A324.

Court of Appeals of Indiana, First District.

Nov. 9, 1982.

---

Wm. C. Welborn, Jr., Evansville, for appellant.

James F. Flynn, Newman, Trockman, Lloyd, Flynn & Rheinlander, P.C., Evansville, for appellees.

ROBERTSON, Judge.

Earl Kramer, defendant-appellant, appeals the trial court's decision which granted Larry and Margaret Ragers', plaintiff-appellees, complaint and denied his counterclaim. Ragers sought injunctive relief to prevent Kramer from blocking their sewer

drainage pipe adjacent to his land. In turn, Kramer sought to enjoin the Ragers from draining sewer water and surface water onto his land and he sought damages.

The facts reveal that Kramer and Ragers own adjoining lots in Posey County in an area known as Kramer Subdivision, Section A. Kramer platted the subdivision in 1964. Kramer Road runs along the northern edge of the subdivision and provides ingress and egress for all lots in the subdivision. The strip of land dedicated to Posey County for the road is 50 feet wide. Ragers own lot number 15 which is directly east of Kramer's lot number 14. The western boundary of Ragers' lot is the eastern boundary of Kramer's lot. The northern boundary of both lots is Kramer Road.

Ragers purchased their lot and home in January, 1978. Shortly thereafter, they discovered their sewer, a septic system, was malfunctioning and sought the advice of a contractor, George Wood. He advised Ragers to install an aeration system rather than attempting to repair their septic system. They agreed and in April, 1978, Wood began work. The aeration system consists of a tank to accept output from the septic tank. In this tank air is forced through to break down sewage and the water is treated with chlorine to purify it. The treated water is discharged into a pipe which runs north from Ragers' home parallel to and approximately 6 feet from the western boundary of their property and into the easement of Kramer Road. In the easement, the pipe turns and runs approximately 30 feet west to within 6 inches of an 8 inch culvert under Kramer Road. Kramer placed the culvert under the road when he built it to accept water from the subdivision.

While Wood was laying this pipe, Kramer came upon the scene and challenged the installation. He contended placement of the pipe violated a restrictive covenant which prohibited locating sewer systems within 25 feet of the boundary between lots. Wood explained that he was installing an aeration system rather than a septic system with a field bed. He told Kramer the system would discharge water, but he was unable to give an exact estimate of how much water. Kramer then assisted Wood in placing the pipe.

After the system functioned for a while, Kramer noticed water standing north of Kramer Road. He owns this land in addition to lot 14 and it is known as Kramer Subdivision, Section B. The land has not been subdivided. When this dispute arose, Kramer was growing hay on it and his family used it for recreation. About March 21, 1979, Kramer spoke with Mr. Rager who apparently indicated another neighbor's wash water was causing the problem. Kramer told him that the system was illegal and that he intended to tear out the pipe when he began work on lot 14.

On May 30, 1979, Kramer was using a backhoe to remove dirt which he had placed at the front of lot 14 between the culvert and Ragers' lot. He dug into the pipe and severed it. Then, depending on whose version of the incident one refers to, Kramer either carefully gathered the pieces and laid them on the Ragers' lot or he simply threw them onto their lot.

Mrs. Rager witnessed these events and telephoned her husband to come home. He arrived and spoke with Kramer who informed him the damage was accidental. Later Rager rearranged the broken pieces of pipe to try and achieve some drainage. On June 3, 1979, Kramer became aware of this and with his sons' help, he again removed the pipe. One son dug a depression along the road in the area where the pipe had been laid to trap water on the south side of Kramer Road and thus protect the northern hay fields. Water did pool on the south side.

As a result, Ragers sought temporary and permanent injunctive relief as well as damages on July 2, 1979. They alleged that Kramer had interfered with the reasonable enjoyment of their property by severing the pipe and that they had no adequate remedy at law. They also sought damages for depreciation of their property and for physical problems which Mrs. Rager alleged were caused by incidents with Kramer.

The trial court denied Ragers a temporary injunction on October 31, 1979, and made findings of fact and conclusions of law. The essence of the trial court's findings was that Ragers had no interest in the public easement, that Kramer therefore had not interfered with their property, and that Ragers had "unclean hands" because they had not complied with Ind.Code 18–5–4–1 and 8–1–23–5.[1] The court also found that these provisions gave the Ragers an adequate remedy at law.

When the trial court ruled on the temporary injunction, Ragers had a permit to repair their sewer which had been approved by the county engineer, but they had not pursued either statutory procedures. Wood, the sewer contractor, had been told by the county engineer who issued the repair permit that he could drain Ragers' sewer into the easement along Kramer Road. After the ruling on their request for a temporary injunction, but prior to the final hearing on the merits in this case, Ragers followed the appropriate statutory procedures. The Posey County Commissioners granted them permission to lay pipe in the easement and to drain sewage effluent into the easement.

On February 20, 1980, Kramer filed his counterclaim alleging Ragers had discharged both noxious sewer water and surface water onto his property, both north and south of Kramer Road, which prevented him from raising hay on the northern property and diminished the value of lot 14 making it unmarketable. Kramer also alleged Ragers were violating provisions of a restrictive covenant applicable to Kramer Subdivision, Section A, which prohibits field beds with 25 feet of the lots boundary lines. He claimed Ragers were maintaining a public nuisance by violating the restrictive covenants and Indiana law. Finally, he argued the water on his property was a trespass. Kramer sought injunctive relief, actual damages, punitive damages, and attorney fees. The claim for punitive damages was predicated on the assertion that Ragers had violated the trial court's earlier ruling on Ragers' request for a temporary injunction.

On May 12, 1981, the trial court entered judgment permanently enjoining Kramer from tampering with Ragers' drain pipe in the easement. Kramer's counterclaim was denied and he was assessed costs.

On appeal, Kramer raises several issues. First, he argues the trial court was bound by its findings of fact and conclusions of law entered October 31, 1979, when it denied the temporary injunction and was therefore precluded from granting Ragers injunctive relief. Kramer essentially treats the October 31 ruling as being *res judicata* for all the issues raised by this litigation. We disagree.

█ A ruling on a temporary injunction is not a judgment on the merits of a case. *Green v. Board of Com'rs of County of Scott,* (1969) 251 Ind. 535, 242 N.E.2d 844. The purpose of a temporary injunction is to preserve the status quo pending adjudication of a case on the merits. *Green, supra.* Thus, a plaintiff is not required to present evidence which would entitle him to ultimate relief. *Powell v. Powell,* (1974) 160 Ind.App. 132, 310 N.E.2d 898. Therefore, a trial court is not bound by findings made on a request for temporary injunction when deciding the balance of a case. *Cement-Masonry Wkrs. U., Etc. v. Ralph M. Williams Enter.,* (1976) 169 Ind.App. 647, 350 N.E.2d 656. Also in the case at bar, contrary to Kramer's assertion, additional evidence was introduced at trial on the merits pertaining to natural drainage in the subdivision and showing the Ragers had obtained proper authorization to use the easement.

Next, Kramer argues that the evidence is insufficient to support the trial court's findings and therefore, that its conclusions of law are incorrect.

The trial court made the following relevant findings of fact and conclusions of law:

---

1. Both sections deal with local governmental units power to contract with various parties, including private individuals, to allow them to use public highway, easement. IC 18–5–4–1 has been repealed since this case began. Current law is located at Ind.Code 36–9–6–13 which now applies only to various utilities.

4. The natural flow of drainage in the Subdivision is from the South (the higher elevation in this Subdivision) to the North, and across the 50-foot right-of-way, the paved portion of which is known as Kramer Drive. Said natural flow of drainage crosses Kramer Drive from South to North by means of a culvert, constructed in 1964, to follow a natural watercourse that continues its northward course to the north of Kramer Drive, and has existed for over 30 years.

5. The defendant constructed said culvert at the time the Defendant constructed the Subdivision in 1964; that said subdivision was afterwards approved on May 4, 1964 by the Board of Commissioners of Posey County.

9. On May 30, 1979, and again on June 3, 1979, the defendant disconnected the Plaintiffs' pipe from the aforesaid culvert, and now refuses to voluntarily permit the Plaintiffs to drain the system's treated effluent into and through said culvert.

10. On April 7, 1980, the Board of County Commissioners of Posey County, acting by and through Gene Mulkey, John Schmitzer and Carl Kohlmeyer, the duly elected members of that Commission, entered into a contract with Larry Rager and Margaret J. Rager, whereby they, for the consideration therein set forth, agreed as follows:

1. To permit, suffer and allow the drainage of effluent into and upon county right-of-way which effluent shall be lawfully treated in compliance with state and local health codes, by means of an aeriation [sic] sewage disposal system serving a single-family dwelling unit in, under and upon Lot 15 in Kramer's Subdivision in Posey County, Indiana.

2. To permit, suffer and allow the installation of any pipe or drain convenient or necessary to conduct, drain or dispose of any such effluent in, under and upon county right-of-way which carries effluent from an aeriation [sic] sewage disposal system, lawfully treated in compliance with state and local

health codes, serving a single-family dwelling unit upon Lot 15 in Kramer's Subdivision in Posey County, Indiana.

11. That the drainage of effluent into and upon said county right-of-way does not unreasonably increase the flow of liquid into the natural drainage system.

12. The Plaintiffs have no adequate remedy at law for relief from the Defendant's obstruction of Plaintiffs' access to a natural watercourse serving the Rager Home.

13. Defendant has failed to establish by sufficient evidence the Plaintiffs' violation of the subdivision restrictions for Kramer's Subdivision, Section "A", or the existence of a public nuisance created or maintained by the Plaintiffs, as alleged in Defendant's Amended Counterclaim.

When reviewing the sufficiency of evidence in an action tried to the court, we will not reverse the trial court's findings unless they are clearly erroneous. Ind.Rules of Procedure, Trial Rule 52. *Franzen v. Campbell,* (1980) Ind.App., 398 N.E.2d 1379.

We agree with Kramer's argument in regard to some of the court's findings; however, we do not find reversible errors.

It is important to note that the emphasis in this case shifted from the issue of sewer effluent drainage to the issue of surface water drainage when Kramer became aware Ragers were channelling rain water through the drain pipe in addition to sewage effluent. He became aware of this fact just prior to trial on the merits and amended his counterclaim accordingly. In the interim, Ragers have disconnected their gutters from the pipe.

The trial court found that the natural flow of drainage in the area was from south to north across Kramer Road and through the culvert. The trial court concluded a natural watercourse existed. The trial court also concluded Kramer was blocking access to the watercourse. The trial court erred.

A natural watercourse is established when surface water begins to flow in a definite channel formed with well defined

banks and bottom and water flows therein, not necessarily continually but from time immemorial and for a substantial period each year.

*Davidson v. Mathis,* (1979) Ind.App., 389 N.E.2d 364, 365, quoting *Lowe v. Loge Realty Co.,* (1966) 138 Ind.App. 434, 436, 214 N.E.2d 400, 402.

■ The evidence on drainage established that a depression existed in the area of lot 14 and Kramer's property north of Kramer Road. This depression accepted water from the Kramer subdivision to the south, east, and west and had done so for 30 years. There was no evidence of any well defined stream bed and thus, no evidence of a natural watercourse. Therefore, the trial court's finding that Kramer obstructed a natural watercourse is erroneous.

Instead the evidence reveals that Kramer's property, both north and south of Kramer Road, was a surface drain for surface water from the subdivision. Surface water and surface drains were defined in *Capes v. Barger,* (1953) 123 Ind.App. 212, 214–215, 109 N.E.2d 725, 726:

> Water from falling rains or melting snows which is diffused over the surface of the ground or which temporarily flows upon or over the surface as the natural elevations and depressions of the land may guide it but which has no definite banks or channel, is surface water. *Taylor, administrator v. Fickas,* 1898 64 Ind. 167; *Ramsey v. Ketcham* [73 Ind.App. 200, 127 N.E. 204], supra.

> If the natural depressions and elevations of the land form a way for water but such way has no well defined banks or channel and carries no water except that which drains into it from adjoining lands in wet seasons or as the result of freshets, then such way is not a natural water course but a mere surface drain and falls within the doctrine that surface water is a *common enemy* which any proprietor may combat as best he can. *New Jersey, etc., R. Co. v. Tutt,* 1907, 168 Ind. 205, 80 N.E. 420; *Gaskill v. Barnett,* 52 Ind.App. 654, 101 N.E. 40. (Emphasis added.).

Given these conclusions and bearing in mind that we will affirm a judgment when a case has been tried to the court on any applicable legal theory, *Torres v. Meyer,* (1981) Ind.App., 423 N.E.2d 692, we turn to the issues of whether the trial court erred by denying Kramer's counterclaim for injunctive relief and by granting Ragers' claim for injunctive relief.

As we explained in *Local No. 135, Internat'l Bros. of Team. Etc. v. Koehler,* (1959) 130 Ind.App. 152, 162 N.E.2d 704, the scope of our review for injunctions is limited.

> It is a well recognized rule of law that *the granting of an injunction by a trial court rests in the "sound discretion" of the court and the granting by a trial court of an injunction should be upheld unless it clearly appears that the court has abused such discretion.* In the case of *Guraly v. Tenta et al.,* 1956, 126 Ind. App. 527, 132 N.E.2d 725, 727, this Court said:

>> "The equitable remedy of specific performance is not available as a matter of right . . . but rests in the sole discretion of the court. . . . Such judicial discretion is not an arbitrary one but is governed by and must conform to the well settled rules of equity. . . . *An abuse of discretion, reviewable on appeal, is an erroneous conclusion and judgment, one clearly against the logic and effect of the facts before the court or against reasonable, probable and actual deductions* to be drawn therefrom. *Bailin v. Bailin,* 1944, 223 Ind. 7, 57 N.E.2d 436." (Emphasis added.)

*Id.* at 161, 162 N.E.2d at 709.

■ There are several other important rules applicable to injunction actions which are relevant to our analysis. A party seeking an injunction has the burden of showing facts which entitle him to an injunction. *Kinzel v. Rettinger,* (1972) 151 Ind.App. 119, 277 N.E.2d 913. Injunctive relief is appropriate in actions involving property rights; in particular, cases involving a continuing trespass, *Selvia v. Reitmeyer,* (1973) 156 Ind.App. 203, 295 N.E.2d 869, and obstruction of an easement, *Lynch v. Keck,* (1970)

147 Ind.App. 570, 263 N.E.2d 176. Actions for injunction are equitable in nature and the various equitable maxims apply to them. *Dean v. State,* (1954) 233 Ind. 25, 116 N.E.2d 503.

Guided by these various rules, we do not think the trial court erred by denying Kramer's counterclaim. Our decision is based in part on our determination that the "common enemy doctrine" is applicable to this case and in part upon Kramer's failure to meet his burden of proving that the sewer water injured his property or that Ragers violated the subdivision's restrictive covenants.

The "common enemy doctrine" was recently interpreted by our supreme court in *Argyelan v. Haviland,* (1982) Ind., 435 N.E.2d 973. The court recognized a limit to the common enemy rule stating:

> [I]t appears that the only limitation upon such rights that we have thus far judicially recognized is that one may not collect or concentrate surface water and cast it, in a body, upon his neighbor.

This language essentially summarizes Kramer's argument concerning surface water discharged on his land. However, the court in *Argyelan* concluded that the defendants' use of downspouts and a nonporous surface, coupled with a retaining wall over which surface water spilled onto plaintiff's property, did not fall within the described exception to the common enemy doctrine. Hence, the defendant was not liable.

■ In light of *Argyelan,* we do not think the trial court erred in the case at bar. The surface water which flowed onto Kramer's lands north of Kramer Road commingled with other water as it entered the culvert under Kramer Road and then discharged onto Kramer's northern property. The only distinctive feature about this case is that the drain pipe crossed intervening land, the county road easement, prior to draining onto Kramer's land. Whether Ragers had a right to utilize pipe to bridge this gap originally or whether they exceeded their rights after permission was granted to lay pipe are matters between the county and Ragers. Kramer's assertion that the southern easement was his property is true only in the technical sense that the land will revert to him if the county ceases to utilize the road. *Gyr v. Hagemann,* (1960) 130 Ind.App. 212, 163 N.E.2d 620.

Similar rationale applies to Kramer's land, lot 14, south of Kramer Road. Ragers were draining into the public easement in front of Kramer's lot from pipe in the easement bordering their lot, ultimately with the county's consent. The water commingled with other water from adjacent lots. Any surface water spreading to lot 14 was not actionable under the common enemy doctrine. *Argyelan, supra.* Additionally, although a lower landowner has the right to protect himself from surface water under the common enemy doctrine, *e.g., Watts v. Evansville Mt. C & N.Ry. Co.,* (1921) 191 Ind. 27, 129 N.E. 315, Kramer dug his protective channel in the easement rather than on his property.

Despite our decision on the issue of surface water drainage, we are constrained to note that the record reveals continuing animosity among landowners in Kramer subdivision with attempts to either drain water on the adjacent parties or to prevent drainage and cause water to pool. Justice Hunter's dissent in *Argyelan,* 435 N.E.2d 978, anticipated such a situation and made the point a major criticism of the majority's interpretation of the common enemy doctrine.

■ Turning to the question of whether the actual treated sewer water was being properly discharged, we find no error. The trial court made a finding of fact that the sewer water discharged did not unreasonably increase the natural drainage in the water shed. Again, as we stated *infra.,* we may not set aside this finding unless it is clearly erroneous. Additionally, Kramer had the burden of proving his injury, *Kinzel v. Rettinger, supra,* and failed to show it was caused by the sewer water instead of the surface water which is not actionable under *Argyelan.*

There was evidence that water in the area accumulated at the front of lot 14 prior to flowing through the culvert. There was also evidence that this was surface water from lots to each side of Kramer's lot and from Kramer's own lot as well as from Ragers' lot. The implication is that most water flowing onto Kramer's northern and southern property was surface water from surrounding lots and surface water from Ragers' property. Also, in relation to Kramer's claim the discharge was noxious, there was evidence the sewer water was clean and properly treated. Kramer has not shown us the trial court's finding was clearly erroneous.[2]

■ We also find no merit to Kramer's assertion that Ragers violated the restrictive covenants applicable to the subdivision. One provision limited the placement of sewer field beds to areas beyond 25 feet of the lots' boundaries. Ragers did not construct a field bed, but instead laid pipe within the restricted area. Nor did Ragers violate nuisance restrictions. The covenants apply to the subdivision; Ragers, however, were draining outside the subdivision until Kramer removed their pipe. This ultimately led to overflow onto lot 14. Thus, Ragers were not interfering with Kramer's lot within the subdivision. Therefore, the trial court did not err by denying Kramer's counterclaim.

■ The last issue before us is whether the trial court erred by granting Ragers an injunction. An injunction is appropriate to remedy continued interference with an easement. *Lynch v. Keck, supra.* Pursuant to IC 18–5–4–1 and IC 8–1–23–5, Ragers were granted an easement to use the public roadway for drainage. 25 Am. Jur.2d *Easements* § 1, 22 (1966). The evidence clearly shows Kramer repeatedly obstructed Ragers' easement. At trial, Kramer stated that he would not voluntarily allow Ragers to use their easement. These facts demonstrate the trial court did not

abuse its discretion by granting Ragers an injunction.

Judgment affirmed.

NEAL, J., concurs.

RATLIFF, P.J., concurs in result with opinion.

RATLIFF, Presiding Judge, concurring in result.

I concur in the result reached by the majority in this case. However, to the extent the majority opinion might imply that the effluent discharged from Ragers' aeration system was surface water, I disagree. Surface water, under all accepted definitions, is water derived from totally natural sources, such as falling rains or melting snows, which is diffused over the surface of the ground and which temporarily flows upon the ground along the natural contours of the surface of the land following no defined course or channel. *Birdwell v. Moore,* (1982) Ind.App., 439 N.E.2d 718; *Capes v. Barger,* (1953) 123 Ind.App. 212, 109 N.E.2d 725; 29 I.L.E. *Waters* § 51 (1960); 78 Am.Jur.2d *Waters* § 117 (1975). Effluent discharged from a septic system or aeration system does not, in my opinion, come within traditional definitions of surface water.

An upper landowner may only discharge surface water in natural ways and quantities, and he may not alter natural conditions or by artificial means increase the flow of water upon the lower landowner. *Gene B. Glick Co., Inc. v. Marion Construction Corp.,* (1975) 165 Ind.App. 72, 331 N.E.2d 26, *rehearing denied* 165 Ind.App. 94, 333 N.E.2d 140, *trans. denied;* 29 I.L.E. *Waters* § 53 (1960). Neither is the lower land servient to surface water which is polluted by the acts of the upper landowner. 29 I.L.E. *Waters* § 54 (1960); 93 C.J.S. *Waters* § 123 (1956). Here, however, the trial court found that the treated sewer water did not unreasonably increase the

---

**2.** The case at bar presents unusual facts and to prevent any potential confusion, we want to make it clear that the discharge of noxious sewer water onto an adjacent landowners property may be actionable under theories of trespass and nuisance when it causes injury. In this case, however, as discussed *infra.,* the injury was caused by the natural water in the area.

natural flow, and it was not established that the effluent was noxious; rather, there was evidence that such effluent was clean. The trial court's findings and judgment are supported by the evidence. Kramer, therefore, did not meet his burden, and I concur in the result.